J-S65014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KAREEN GLASS | |
| Appellant | No. 3142 EDA 2013 |

Appeal from the PCRA Order October 4, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0502891-2005

BEFORE: PANELLA, J., OLSON, J., and PLATT, J.[*]

MEMORANDUM BY PANELLA, J.                    **FILED JANUARY 30, 2015**

Appellant, Kareen Glass, appeals from the order entered October 4, 2013, by the Honorable M. Teresa Sarmina, Court of Common Pleas of Philadelphia County, which denied Glass's Post Conviction Relief Act[1] ("PCRA") petition. We affirm.

Following a jury trial on October 21, 2008, Glass was convicted of murder in the first degree, attempted murder, aggravated assault, possessing an instrument of crime, and recklessly endangering another person.[2] The following day Glass appeared at a penalty phase hearing. At the hearing, Glass's attorney, Jack McMahon, Esquire, indicated to the court

_____

[*] Retired Senior Judge assigned to the Superior Court.
[1] 42 Pa.C.S.A. §§ 9541-9546.
[2] 18 Pa.C.S.A. §§ 2502(a), 901, 2702(a)(1), 907(a) and 2705.

that he had reached an agreement with the Commonwealth whereby Glass agreed to waive his appellate rights in return for withdrawal of the death penalty. *See* N.T., Penalty Hearing, 10/22/08 at 5-6. After much discussion and an extensive colloquy, the trial court accepted the agreement and sentenced Glass to life imprisonment.

Glass filed a *pro se* PCRA petition. The PCRA court appointed Janice Smarro, Esquire, as counsel and Attorney Smarro filed an amended PCRA petition seeking reinstatement of Glass's appellate rights *nunc pro tunc*. Following a hearing, the PCRA court announced notice of its intent to dismiss Glass's petition pursuant to Pa.R.Crim.P. 907. Thereafter, the PCRA court removed Attorney Smarro and appointed David Rudenstein, Esquire, as PCRA counsel. Attorney Rudenstein filed a second amended PCRA petition, in which he alleged that trial counsel's lack of preparation for the penalty hearing caused Glass to waive his appellate rights. Following evidentiary hearings, the trial court denied Glass's PCRA petition. *See* Order, 10/04/13. This timely appeal followed.[3]

On appeal, Glass raises the following issue for our review:

Was [Glass] denied the effective assistance of capital sentencing counsel who, as a matter of adjudicated fact, was not prepared

---

[3] Glass filed a *pro se* notice of appeal on October 23, 2014. The PCRA court conducted a *Grazier* hearing, at the conclusion of which the court accepted Glass's *pro se* notice of appeal and removed Attorney Rudenstein as counsel. *See* Order, 11/21/13. Todd Michael Mosser, Esquire, then entered his appearance for the purposes of this appeal.

to proceed to sentencing, and in turn, caused [Glass] to waive all of his appellate rights, which included waiving viable issues for direct appeal as well as a colorable ineffective assistance of trial counsel claim under the PCRA?

Appellant's Brief at 4.

"Our standard of review of a trial court order granting or denying relief under the PCRA calls upon us to determine whether the determination of the PCRA court is supported by the evidence of record and is free of legal error." **Commonwealth v. Barndt**, 74 A.3d 185, 191-192 (Pa. Super. 2013) (citation and internal quotation marks omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." **Id**. (citation omitted). The PCRA court's credibility determinations are binding on this Court, where there is record support for those determinations. **See Commonwealth v. Timchak**, 69 A.3d 765, 769 (Pa. Super. 2013).

To establish ineffectiveness of counsel, "a PCRA petitioner must show the underlying claim has arguable merit, counsel's actions lacked any reasonable basis, and counsel's actions prejudiced the petitioner." **Commonwealth v. Jones**, 71 A.3d 1061, 1063 (Pa. Super. 2013) (citation omitted), **appeal denied**, 84 A.3d 1062 (Pa. 2014). "Prejudice means that, absent counsel's conduct, there is a reasonable probability the outcome of the proceedings would have been different." **Id**. If a reasonable basis exists for the particular course chosen by counsel, the inquiry ends and counsel's performance is deemed constitutionally effective. **Commonwealth v. Lauro**, 819 A.2d 100, 106 (Pa. Super. 2003) (citations

omitted). Failure to satisfy any prong of the test requires that the claim be dismissed. *See Commonwealth v. O'Bidos*, 849 A.2d 243, 249 (Pa. Super. 2004).

Glass's waiver of appellate review in exchange for the Commonwealth's agreement to a sentence of life imprisonment was undoubtedly the functional equivalent to the entry of a guilty plea. *Accord Commonwealth v. Barnes*, 687 A.2d 1163, 1167 (Pa. Super. 1996), *appeal denied*, 693 A.2d 585 (Pa. 1997) (waiver of post-trial review functional equivalent of plea of guilty). "A criminal defendant has the right to effective counsel during a plea process as well as during trial." *Commonwealth v. Rathfon*, 899 A.2d 365, 369 (Pa. Super. 2006) (quotation omitted). "Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused the defendant to enter an involuntary or unknowing plea." *Commonwealth v. Hickman*, 799 A.2d 136, 141 (Pa. Super. 2002) (citation omitted). "Where the defendant enters his plea on the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." *Id*. (citations and internal quotation marks omitted). "A person who elects to plead guilty is bound by the statements he makes in open court while under oath and he may not later assert grounds for withdrawing the plea which contradict the statements he made at his plea colloquy."

***Commonwealth v. Pollard***, 832 A.2d 517, 523 (Pa. Super. 2003) (citation omitted).

Instantly, the PCRA court agreed with Glass that defense counsel was unprepared to present mitigation evidence at the penalty phase hearing.[4] However, the court determined that counsel's lack of preparedness for the penalty hearing did not render the waiver of Glass's appellate rights unknowing or involuntary. The PCRA court concluded, among other things, that Glass "failed to demonstrate that, but for counsel's lacking penalty phase preparation, petitioner would have elected not to waive his appellate rights and would have instead proceeded to the penalty phase hearing." PCRA Court Opinion, 2/6/14 at 13.

After careful review of the briefs submitted by counsel and the record in this matter, we find that the Honorable M. Teresa Sarmina has so thoroughly addressed and properly rejected the issue raised by Glass that further discussion of the issue would be purposeless. Accordingly, we adopt the opinion of the PCRA court as fully dispositive of the issue raised on appeal. ***Id***. at 7-16. Therefore, we affirm the order denying PCRA relief.

Order affirmed.

_____

[4] The PCRA court thoroughly details the facts and reasoning behind this conclusion in its 1925(a) opinion. ***See*** PCRA Court Opinion, 2/6/14 at 5 n.12.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/30/2015

PHILADELPHIA COURT OF COMMON PLEAS
CRIMINAL TRIAL DIVISION

COMMONWEALTH       :

           :      CP-51-CR-0502891-2005

     v.          :      Superior Court No.
           :      3142 EDA 2013

KAREEN GLASS       :

Sarmina, J.
February 6, 2014

**FILED**

FEB 0 6 2014

Criminal Appeals Unit
First Judicial District of PA

OPINION

## PROCEDURAL HISTORY

On October 21, 2008, following a jury trial[1] before this Court, Kareen Glass (hereafter,

petitioner) was convicted of murder of the first degree (H-1) for the death of Tyreke Gaymon

(Tyreke), attempted murder (F-1) of Tyreese Allen (Tyreese), aggravated assault (F-1) of Tyreese,

possessing an instrument of crime (PIC) (M-1), and recklessly endangering another person (REAP)

(M-2).[2] The next day, petitioner appeared before this Court to begin a penalty phase hearing.

Instead, on that date, after consultation with counsel, petitioner agreed to waive all appellate and

post-conviction rights[3] in exchange for receiving a life sentence without the possibility of parole; this

Court conducted a colloquy with petitioner regarding that waiver and found it to be knowing,

intelligent and voluntary. Notes of Testimony (N.T.) 10/22/2008 at 42. This Court then sentenced

---

[1] Petitioner was represented at trial by Jack McMahon, Esquire.

[2] 18 Pa.C.S. §§ 2502(a), 901, 2702(a)(1), 907 (a), and 2705, respectively.

[3] Petitioner agreed to waive his rights to file a direct appeal, a PCRA petition, an application for commutation of sentence, as well as an application for pardon. Notes of Testimony (N.T.) 10/22/2008 at 42. This Court refers to the rights forfeited by petitioner, collectively, as his "appellate rights."

petitioner to the mandatory term[4] of life imprisonment.[5]

On July 10, 2009, petitioner filed a timely *pro se* petition pursuant to the Post-Conviction Relief Act (PCRA).[6] On October 21, 2011, David Rudenstein, Esquire, filed an amended petition.[7] Mr. Rudenstein supplemented his amended petition with an additional filing on July 12, 2012. On September 14, 2012, the Commonwealth filed its answer; Mr. Rudenstein responded on November 19, 2012 and again on February 19, 2013. On April 26, 2013 and April 29, 2013, this Court held an evidentiary hearing pursuant to Pa.R.Crim.P. 908 (908 Hearing) to address petitioner's claim that trial counsel was ineffective for coercing petitioner to waive his appellate rights. At the conclusion of the 908 Hearing, Mr. Rudenstein requested an opportunity to review the notes of testimony from the hearing and to present oral argument at a later date. N.T. 4/29/2013 at 130. On July 9, 2013, this Court heard argument. After considering the pleadings, the evidence presented at the 908 Hearing, the oral argument, and conducting an independent review, this Court found that petitioner's claims lacked merit and, on September 11, 2013, sent petitioner notice pursuant to Pa.R.Crim.P. 907 (907 Notice) of its intent to deny and dismiss his petition. On October 4, 2013, this Court denied and dismissed petitioner's petition.[8] Petitioner filed a timely notice of appeal.[9]

---

[4] 18 Pa.C.S. § 1102(a).

[5] As to the conviction for attempted murder, petitioner was sentenced to a consecutive term of not less than 20 years nor more than 40 years confinement. N.T. 10/22/2008 at 48. As to the conviction for PIC, this Court imposed a concurrent sentence of not less than nine months nor more than five years confinement. Petitioner's convictions for aggravated assault and REAP merged for purposes of sentencing.

[6] 42 Pa.C.S. §§ 9541-9546.

[7] On October 5, 2009, James Lammendola, Esquire, had been appointed to represent petitioner. However, this Court found that he had not zealously represented his client. On April 8, 2010, this Court removed Mr. Lammendola and appointed Janis Smarro, Esquire. In June 2011, Ms. Smarro informed this Court that she was no longer taking appointments in capital cases. As petitioner sought to challenge his appellate waiver, thus potentially subjecting him to the death penalty, Ms. Smarro requested to withdraw. On June 17, 2011, this Court permitted Ms. Smarro to withdraw.

[8] Prior to dismissing petitioner's petition, this Court received a *pro se* response to the 907 Notice from petitioner, postmarked September 27, 2013. As petitioner was still represented by Mr. Rudenstein at the time of his response, this Court immediately had petitioner's response hand-delivered to Mr. Rudenstein, so he could formulate a 907 Response (FN cont'd...)

2

## FACTS

On September 27, 2004, petitioner confronted Maurice Gaymon (Maurice) on the 1300

block of North 15th Street in Philadelphia about an incident in which petitioner's coworkers had

been robbed. N.T. 10/8/2008 at 179. Petitioner asked Maurice whether he had heard about the

robbery; when Maurice said that he was unaware, petitioner told Maurice, "If I can't get at the

[people] who did it, I'm going to get at the people they be with [sic]." Id. On September 28, 2004,

Maurice, Tyreke, Tyreese and Stanley Battle (Battle) were selling crack cocaine in front of the same

house where petitioner had approached Maurice the day before. Id. at 182. Battle left the front

steps to get a snack from a local market. N.T. 10/9/2008 at 219. Maurice retreated into the house

to make a phone call. Id. at 65. Shortly thereafter, petitioner and a friend walked up to the curb,

eight or nine feet in front of Tyreke and Tyreese.[10] Id. at 65-66. Petitioner accused Tyreke and

Tyreese of knowing who robbed his friend. Id. Both Tyreke and Tyreese denied involvement. Id.

at 67. Petitioner then pulled a gun from his waist, and opened fire. Tyreese survived five gunshot

wounds to his legs and abdomen. Id. at 69.

> As he pulled the gun out, I stood up. And as soon as I stood up, he shot me in my leg.
> Then he shot me again on the same leg. So I spin and I try to go in the hallway. He started
> shooting at Tyreke. Then as I go in the hallways, he shoot [sic], he shoot [sic] at me again.

---

(FN cont'd...)
for this Court's consideration, if appropriate. See Commonwealth v. Glacken, 32 A.3d 750, 752 (Pa.Super. 2011)
("Pursuant to our Rules of Appellate Procedure and decisional law, this Court will not review the *pro se* filings of a
counseled appellant.").

[9] On October 21, 2013, while still represented by Mr. Rudenstein, petitioner filed a *pro se* notice of appeal. On that same
date, petitioner wrote to this Court, expressing his desire to proceed *pro se*. This Court scheduled a hearing, pursuant to
Commonwealth v. Grazier, 713 A.2d 81 (Pa. 1998), for November 1, 2013 – less than 30 days after petitioner's PCRA
petition had been dismissed and, thus, within the time frame to file a notice of appeal. However, due to extenuating
circumstances involving oral argument in a separate capital PCRA litigation, this Court was unable to hold the Grazier
hearing as scheduled. This Court rescheduled the Grazier hearing for November 19, 2013, on which date this Court
accepted petitioner's October 21, 2013 notice of appeal as controlling, removed Mr. Rudenstein, and appointed new
counsel on petitioner's behalf. On November 22, 2013, Todd Michael Mosser, Esquire, entered his appearance. On
January 6, 2014, Mr. Mosser filed a Statement of Matters Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b)
(1925(b) Statement).

[10] Tyreese Allen testified at a preliminary hearing on April 26, 2005. As Allen had died prior to petitioner's trial and thus
was unavailable, his preliminary hearing testimony was admitted at trial pursuant to Pa.R.E. 804(b)(1).

3

> Then when he had hit me in this leg, as he hit me in this leg, my whole – I lost all feeling in my leg. So I collapsed to the ground – as I collapsed to the ground, I started crawling. This guy still shooting.
>
> So the next thing you know, he finally stops shooting. I call for my aunt and everybody to come outside. I see him running down the street or whatever, but I turned around and told Tyreke to hold on. I'm like hold on, everybody, because they called on – they called the cops and the cops on they way [sic]. Tyreke lift his head up, laid his head back down, and ain't move again.

N.T. 10/9/2008 at 68.

On Battle's walk back from the store, as he was four or five houses away from his friends, he saw petitioner pull a gun from his waist band and begin shooting. Id. at 226. As petitioner lifted his gun and shot Tyreke, Battle froze. Id. "I'm still looking at him. Then he start [sic] looking rapidly, boom, boom. I took off running. I didn't want him to cut his eye on me, start shooting at me. I took off running." Id. After running around the block, Battle returned to the front porch to find Tyreke "dead" with a "big hole in his head," and Tyreese yelling for help in pain. Id. at 232.

Tyreke was pronounced dead at the scene of the shooting at 10:25 AM. Id. at 124. He suffered a perforating gunshot wound to the left side of his head, passing through his brain before exiting the right backside of his head.[11] N.T. 10/9/2008 at 127.

## LEGAL ANALYSIS

Petitioner raised three claims in his 1925(b) Statement. As the facts underlying claims two and three are closely related, this Court will address those two issues together.

### (1) The PCRA Court erred by finding that sentencing counsel's unpreparedness did not "cause" petitioner to waive his appellate rights.

Petitioner contends that sentencing counsel was ineffective, as he was ill-prepared to represent petitioner at a penalty phase hearing and, therefore, petitioner's waiver of his appellate rights was not knowing, intelligent and voluntary. Supplemental Amended Petition, 7/12/2012 at 2-3. "Having been unprepared to proceed, counsel was in no position to offer any competent,

---

[11] Tyreke also suffered gunshot wounds to his left shoulder and abdomen. N.T. 10/9/2008 at 130-32.

4

objective advice about [petitioner's] chances at [a penalty phase] hearing." 1925(b) Statement, 1/6/2014 at 2. Petitioner argues that counsel's lack of preparedness vitiated the voluntariness of his waiver. Id.

This Court found that sentencing counsel was, in fact, unprepared to present a penalty phase hearing.[12] However, claims of ineffective assistance of counsel in the context of entering a waiver of

---

[12] This Court found that Mr. McMahon was not prepared to represent petitioner adequately at the penalty phase proceeding. Mr. McMahon was aware that petitioner had suffered significant cognitive damage as the result of a beating by police officers. N.T. 4/26/2013 at 59-60. However, Mr. McMahon did not secure a witness who could have explained, to a reasonable degree of scientific certainty, the cognitive impairments that petitioner suffered. Mr. McMahon stated that he planned to introduce evidence that petitioner's capacity to appreciate the criminality of his conduct was substantially impaired – pursuant to 42 Pa.C.S. § 9711(e)(3) – in two ways: (1) through the testimony of Neil Jokelson, Esquire, one of the attorneys who had represented petitioner in his federal civil trial against the City of Philadelphia for that beating by the police, and (2) through medical records, which had been introduced at that trial:

> And, again, to me, it was going to make a very fine presentation because it was going to be a – they [the Jokelsons] were going to humanize them [the records]. And at the same time they were going to put in the necessary scientific doctor reports that would meet the mitigating circumstances.

Id. at 106.

> We would have clearly, without a doubt, been able to explain that both through the testimony of the Jokelsons and the expert reports and the testimony that came from the trial. And if you don't think that, you're a fool.

Id. at 112.

Mr. McMahon's two-pronged approach was flawed. First, Mr. McMahon conceded, and this Court found, that he never actually read the transcripts of the civil trial:

> MR. RUDENSTEIN: Did you read the transcripts of the civil trial?
> MR. McMAHON: Probably not in totality, no. I don't think I did. I mean, I – I can't remember, but I would probably say no.

Id. at 53.

And second, Neil Jokelson readily admitted that he was not qualified to explain petitioner's cognitive deficiencies to a jury:

> MR. RUDENSTEIN: Did you ever advise Mr. McMahon that you didn't feel that you were the one that was qualified to testify as to Mr. Glass' medical conditions?
> MR. JOKELSON: Oh, I think that was obvious. And I considered myself, in a sense, a secondary source. And I had [a] real question in my mind as to whether I could even be qualified to testify to read in the testimony or read reports I had received from medical providers or had been offered before the federal court.

Id. at 186.

Mr. McMahon was so unprepared as to be unaware that Neil Jokelson could not have illustrated the scientific details necessary to understand the brain injuries that petitioner suffered. Therefore, an explanation as to how petitioner (FN cont'd...)

appellate rights must still pass through the three-pronged <u>Strickland</u>/<u>Pierce</u> ineffectiveness test. As petitioner failed to demonstrate (a) that his claim has arguable merit, as he entered into a valid waiver, and (b) that there was a reasonable probability that, but for counsel's lack of preparation, he would have elected to proceed to a penalty phase hearing, this Court was constrained to deny petitioner relief.

A waiver of appellate rights is the "functional equivalent of a plea of guilt." <u>Commonwealth v. Barnes</u>, 687 A.2d 1163, 1167 (Pa.Super. 1996). A criminal defendant's right to effective counsel extends to the plea/waiver process. <u>Commonwealth v. Willis</u>, 68 A.3d 997, 1001 (Pa.Super. 2013). An individual challenging counsel's representation during that critical stage bears the burden to establish that (1) his underlying claim is of arguable merit, (2) counsel lacked any reasonable basis for the act or omission alleged, and (3) that there is a reasonable probability that, but for the act or omission challenged, the outcome of the proceeding would have been different. <u>Commonwealth v. Fowler</u>, 893 A.2d 758, 765 (Pa.Super. 2006).

In order for a guilty plea/waiver of appellate rights (waiver) to be constitutionally valid, "[a]ll that is required is that [a defendant's] decision to [waive those rights] be knowingly, voluntarily and intelligently made." <u>Commonwealth v. Brown</u>, 48 A.3d 1275, 1277 (Pa.Super. 2012), *quoting* <u>Commonwealth v. Moser</u>, 921 A.2d 526, 528-29 (Pa.Super. 2007). If the totality of the circumstances surrounding the plea or waiver shows that the defendant "understood what the plea [or waiver] connoted and its consequences," the plea or waiver will be deemed knowing, voluntary

---

(FN cont'd...)
lacked the capacity to appreciate the criminality of his conduct could only have come from the records of petitioner's civil case. As Mr. McMahon had not reviewed those records, he was not prepared to represent petitioner at his penalty phase proceeding, which was imminent.

In petitioner's civil cases, multiple New York University doctors were used to establish that petitioner had endured significant brain injuries from the beating that he had suffered. <u>Id.</u> at 176. Mr. McMahon failed to secure expert witnesses who could have explained, to *this* jury, the science behind petitioner's cognitive damage. In fact, Mr. McMahon was largely unaware of what those doctors had stated in the civil proceedings. N.T. 4/26/2013 at 65-67. Although a persuasive case of mitigation *could have been* presented, Mr. McMahon failed to take the steps to ensure that it *would have been* presented.

and intelligent. Commonwealth v. Fluharty, 632 A.2d 312, 314 (Pa.Super. 1993). Even where an omission or defect exists in a guilty plea colloquy, the plea will be valid as long as "the circumstances surrounding the entry of the plea disclose that the defendant had a **full understanding of the nature and consequences of his plea** and that he knowingly and voluntarily decided to enter the plea." Id. (emphasis added).

To demonstrate "arguable merit" when challenging an attorney's ineffectiveness in the context of a plea, a petitioner must show that counsel's act or omission caused the defendant to enter an involuntary or unknowing plea. Commonwealth v. Rathfon, 899 A.2d 365, 369 (Pa.Super. 2006). For an attorney to cause a defendant to enter into an involuntary or unknowing plea, the attorney must negatively impact his client's understanding of the "nature and consequences of his plea." Fluharty, 632 A.2d at 314; see also Commonwealth v. Hickman, 799 A.2d 136, 141 (Pa.Super. 2002) (finding plea counsel ineffective where he advised the defendant to plead guilty based on the expectation that he could be released from prison in two years and eligible for parole in six months when, in fact, the defendant was ineligible for parole until after serving at least four years in prison); Rathfon, 899 A.2d at 371 (holding that plea counsel was ineffective for advising the defendant to accept a plea which precluded the possibility of serving time in county jail, which was the sentence that the defendant had bargained for); Commonwealth v. Barndt, 74 A.3d 185, 196 (Pa.Super. 2013) (finding plea counsel ineffective where he provided inaccurate information "regarding the maximum setback time Appellant would receive as a consequence of his guilty plea"). In each situation, an attorney's deficient performance was rooted in the fact that he had inaccurately advised his client concerning a *consequence* of pleading guilty.

In the case *sub judice*, petitioner's plea colloquy and the evidence introduced at the 908 Hearing demonstrated that petitioner understood "the nature and consequences" of his appellate waiver. After the jury found petitioner guilty of murder of the first degree and a host of other

7

crimes on October 21, 2008, the case was ready to proceed to a penalty-phase hearing the next morning. At that time, Mr. McMahon informed this Court that petitioner intended to waive his appellate rights in exchange for a guaranteed life sentence. N.T. 10/22/2008 at 5-6. Both Mr. McMahon and this Court questioned petitioner extensively about his decision to enter into the waiver; petitioner testified under oath that he understood the consequences of waiving his right to a penalty-phase hearing:

> MR. McMAHON: And what it is my understanding based on everybody's discussions, but most importantly you, that you're agreeing today to waive your right to appeal both direct appeal to the Superior Court and/or the Supreme Court and any Post-Conviction Relief Act action alleging either ineffective assistance of counsel or any other cognizable PCRA hearing. Do you understand that?
> PETITIONER: Yes.
> MR. McMAHON: Okay. And you're giving up these rights today and to take any action in a Federal courthouse, that is to file a Federal habeas petition saying that the constitutional rights were deprived of you [sic] in this case. Do you understand that?
> PETITIONER: Yes.
> THE COURT: You mean that he was deprived of his constitutional rights?
> MR. McMAHON: Deprived of his constitutional rights, federal constitutional rights. Do you understand that?
> PETITIONER: Yes.
> MR. McMAHON: These are all options you would have at a later point in time, but you are agreeing to give those up and in return for that agreement to give those up –
> THE COURT: In addition, there's also no seeking of commutation [sic] sentence.
> MR. McMAHON: I will get to that, I'm sorry.
> THE COURT: Okay.
> MR. McMAHON: – agreement to give those up, those rights to appeal federally, post-conviction or direct appeals to the state court, in return for that for your agreeing [sic] to do that, the Commonwealth will not seek the death penalty against you and the sentence of life in prison will be imposed, the jury will not be asked to find the death penalty and they will be excused. Do you understand that?
> PETITIONER: Yes.
> MR. McMAHON: And you understand that also in addition to that there's going to be a sentence, agreed upon sentence of 20 to 40 years on the shooting of Tyreese in this case, but as I spoke to you in the back, a life sentence is a life sentence, so that really won't add any more time to your case. Do you understand that?
> PETITIONER: Yes.
> MR. McMAHON: Okay. And you understand that you are also pursuant to this agreement giving up your right to ask a governor at some point in time to commute your sentence or a parole board to pardon you or the governor to pardon you at a later point in time. Do you understand that?
> PETITIONER: Yes.

8

MR. McMAHON: So in essence then what you're giving up is the right to take any further action on this case after today legally and in return for that you will be sentenced to what we just said is life in prison with the 20 to 40 years, but you will not subject yourself to any possible death sentence or being on death row or anything of the sort. Do you understand that?

PETITIONER: Yes.

MR. McMAHON: You've had an opportunity to talk this over with me; correct?

PETITIONER: Yes.

MR. McMAHON: Talk it over with your family; correct?

PETITIONER: Yes.

MR. McMAHON: Okay. And is this your – and you understand that Pennsylvania means life without the possibility of parole? Do you understand that; correct?

PETITIONER: Yes.

THE COURT: A life sentence means you will be in prison for the rest of your life.

MR. McMAHON: Okay. Do you understand that? Right?

PETITIONER: Yes.

MR. McMAHON: But you also understand that as a result of this that you will not be in prison on death row because of your agreement here today? Do you understand that?

PETITIONER: Yes.

Id. at 11-15.

Petitioner agreed that he entered into the waiver of his own free will because of his "own self-interest to avoid the death penalty." Id. at 17. However, towards the end of the colloquy, Assistant District Attorney (ADA) Michael Barry stated, "He has to admit that he did it." Petitioner protested, "I didn't do it." Id. at 18. This Court asked petitioner whether he wished to proceed with a penalty phase hearing, to which he responded, "Yes." Id. Immediately thereafter, this Court explained the machinery of a penalty-phase hearing and reminded petitioner that it was his decision either to go forward with the hearing or to waive his rights. Id. at 25. This Court then took a recess and permitted petitioner to consider the best course of action with the help of Mr. McMahon, family members, as well as with Neil Jokelson, Derrick Jokelson and David Jokelson – three attorneys who had represented petitioner in the civil suit that he had brought against the City of Philadelphia years earlier. N.T. 10/22/2008 at 30-35. Following the recess, Mr. McMahon informed this Court that petitioner had reversed course and wished to complete the waiver. Id. at 36. This Court asked

9

petitioner whether he had been "pressured or threatened in any way in giving any answers that you've given here to the Court." Petitioner responded, "No." Id. at 41.

In this PCRA litigation, petitioner challenged the voluntariness of that waiver, contending that he had, in fact, been pressured to answer as directed by Mr. McMahon and the Jokelson attorneys. Petitioner testified at the 908 Hearing that Mr. McMahon and the Jokelsons were "an intellectual influence overtop of me" and had "coaxed and cajoled" him to waive his rights. N.T. 4/29/2013 at 86. Petitioner described the attorneys' influence as a "spell" which he could not "break." Id. at 122-23.

This Court found that a few individuals with whom petitioner spoke prior to concluding his waiver of appellate rights attempted to persuade him that it was in his best interest to enter into the appellate waiver. Although Mr. McMahon, the Jokelson attorneys, petitioner's father, and petitioner's step-mother[13] tried to convince petitioner to accept the waiver, their pre-waiver discussions did not adversely impact petitioner's understanding of the "nature and consequences" of his plea. Petitioner's father, Reuben Glass, advised his son to waive his appellate rights in exchange for a guaranteed life sentence. N.T. 4/29/2013 at 24. Reuben Glass's significant other, Jane Malloy, also told petitioner to "take the waiver." Id. at 101. Neil Jokelson testified that he encouraged petitioner to waive his appellate rights, as it seemed to be the best option:

> My only motivation was to get him the best possible life that he could get, that is, and by life, I mean existence. And if the choice were between living in a solitary confinement and ultimately being exposed to death as opposed to being in general population, I thought that the choice was clear. And I did, or I would have told him that.

N.T. 4/26/2013 at 213.

David Jokelson stated that he shared with petitioner his "opinion as to what I thought would be in his best interest when I was asked." N.T. 4/26/2013 at 273. He suggested accepting life in

---

[13] Although Reuben Glass, petitioner's father, and Jane Malloy were not officially married, they lived together as partners for more than 20 years. Ms. Malloy considers petitioner to be her step-son. N.T. 4/26/2013 at 41.

prison. Id. Derrick Jokelson remembered that he and petitioner had a prolonged conversation, during which both he and petitioner grew emotional as they confronted this difficult decision. Id. at 241-42. "It was a very emotional discussion. And at the end of the discussion, I think we were both in tears, and he decided to take the deal. That's my recollection. I don't know how to answer it better." Id. at 242. At the conclusion of their conversation, petitioner "had made an affirmative decision" to accept the waiver. Id.

If anything, these endeavors to convince petitioner that it was in his best interest to waive his appellate rights would have helped to illuminate the dire consequences at issue. At the 908 Hearing, petitioner did not claim that the pre-waiver discussions prevented him from understanding the nature and consequences of his waiver. In fact, petitioner acknowledged that he did, in fact, understand when this Court explained the cost of receiving a guaranteed life sentence:

> ADA RITTERMAN: And continuing, do you recall her saying: "You have to make that decision, just like you decided you did not wish to plead guilty and wanted to go to trial, just like you decided that you did not wish to testify and wished me to tell the jury that you had no burden of providing any evidence. So now it's time for you to decide in this case whether you wish to be able to take an appeal or not. The only way you're going to preclude us going to a penalty-phase hearing is by agreeing to not take an appeal or pursue post-conviction collateral rights." Do you recall that?
> PETITIONER: Yes, I do.
> ADA RITTERMAN: And did you understand that at the time?
> PETITIONER: I understood as she was telling me at the time, yes, I did.

N.T. 4/29/2013 at 94-95.

> ADA RITTERMAN: And do you recall the Court saying to you – we're on Page 26 – "I don't want you to give up your appellate rights and be under any impressions that you'll be able to challenge your convictions if you want. It's an important decision. And if you're giving up your appellate rights in order to avoid the possibility of getting a death sentence, I want you to understand exactly what you're giving up." Do you recall that?
> PETITIONER: Yes.
> ADA RITTERMAN: And did you understand that?
> PETITIONER: I understood that.

Id. at 95-96.

11

Additionally, as petitioner swore under oath that he had not been pressured into entering into the appellate waiver, he is bound by that testimony and may not now assert grounds for withdrawing his waiver which contradict those statements. Commonwealth v. Timchak, 69 A.3d 765, 774 (Pa.Super. 2013). Although Mr. McMahon had inadequately prepared to present mitigation evidence at a penalty phase hearing, a fact this Court did not countenance and struggled with during the pendency of this litigation, his failure do so did not negate petitioner's understanding of the "nature and consequences" of entering into the waiver. Not only did petitioner testify during the waiver colloquy that he was aware of the consequences of the waiver, but he also conceded at the 908 Hearing that he understood this Court's explanation of the results which flowed from entering into the appellate waiver. Accordingly, petitioner failed to demonstrate that Mr. McMahon's deficient preparation vitiated his knowing, intelligent and voluntary waiver.

Even if petitioner's allegation of ineffective assistance had "arguable merit," it still would have failed, as petitioner did not demonstrate "prejudice." Deficient preparation – even in anticipation of a penalty phase hearing – does not constitute *per se* ineffective assistance of counsel. Commonwealth v. Sepulveda, 55 A.3d 1108, 1129 (Pa. 2012) ("[E]ven if the investigation conducted by counsel was unreasonable, this fact alone will not result in relief if the defendant cannot demonstrate that he was prejudiced by counsel's conduct."). The "prejudice" prong of the Strickland/Pierce test applies with equal force whether an individual entered a plea or proceeded to trial. Timchak, 69 A.3d at 770, *quoting* Rathfon, 899 A.2d at 370 ("[W]ith regard to the prejudice prong, where an appellant has entered a guilty plea, the appellant must demonstrate 'it is reasonably probable that, but for counsel's errors, he would not have pleaded guilty and would have gone to trial.'"). In Timchak, a PCRA petitioner claimed that plea counsel was ineffective for failing to sufficiently investigate and pursue viable defenses; the petitioner claimed that the attorney's failure to prepare properly deprived the petitioner of the opportunity to engage in an informed discussion

12

about the prospect of challenging the Commonwealth's proof at trial versus pleading guilty. Id. at 770. The Superior Court held that plea counsel was not ineffective because, among other reasons, petitioner failed to demonstrate that, but for counsel's purportedly inadequate investigation, he would not have pled guilty and instead would have gone to trial. Id. at 774.

In this case, petitioner failed to demonstrate that, but for counsel's lacking penalty phase preparation, petitioner would have elected not to waive his appellate rights and would have instead proceeded to the penalty phase hearing. Petitioner testified that he wanted go through with a penalty phase hearing in order to "fight for [his] freedom," but he succumbed to pressure exerted on him by the Jokelson attorneys. N.T. 4/29/2013 at 78-82. In fact, petitioner averred that neither Mr. McMahon's opinion nor his preparation factored into petitioner's decision:

> PETITIONER: Listen, I never really paid Mr. McMahon no mind from day one. I gave him his defense. I gave him his opening statements. I did that. He never did nothing. That's why I said when he came to see me, he never even discussed a defense. Anyway, I wasn't — I wasn't listening to his opinion. It was Neil — it was the Jokelsons that coaxed me into taking that waiver. They shrouded me with two on one side and the other one on the other side, and Jack was whispering things, but it was them rubbing my back as I said it. "Go through with it," you know, and all that kind of stuff. I — no way in the world I would have did it.

Id. at 82.

At the 908 Hearing, petitioner never claimed that he was motivated to enter the waiver because he had critically examined Mr. McMahon's preparation and felt it to be inadequate. In fact, during a hearing before this Court on June 17, 2011, petitioner admitted that, at the time he entered into the appellate waiver, he did not know that Mr. McMahon was ill-prepared to proceed with a penalty-phase hearing. N.T. 7/11/2011 at 20-21 ("I — in hindsight I know. I didn't know at the time."); N.T. 4/29/2013 at 108. As petitioner was unaware that Mr. McMahon was not ready for the penalty phase, and generally preferred to ignore Mr. McMahon's input, it is clear that petitioner's motivation to accept a guaranteed life sentence was not based on Mr. McMahon's deficient performance. Petitioner failed to demonstrate that, but for Mr. McMahon's inadequate preparation,

13

he would have rejected the appellate waiver and would have proceeded to a penalty-phase hearing. Accordingly, this Court properly determined that petitioner's claim failed.

**(2) PCRA counsel rendered ineffective assistance for failing to argue that trial counsel was ineffective for allowing the Jokelson attorneys to improperly coerce petitioner into waiving his appellate rights.[14]**

Petitioner claims that PCRA counsel was ineffective for failing to allege that trial counsel was ineffective for allowing the Jokelson attorneys to coerce him to waive his appellate rights. Additionally, petitioner contends that trial counsel was ineffective for failing to correct the Jokelson attorneys when they attempted to influence petitioner to accept the waiver by representing that there were no worthwhile appellate issues to litigate. As noted *supra*, petitioner alleged that he was "coaxed and cajoled into this waiver." N.T. 4/29/2013 at 86. "They cajoled me through the whole process." Id. at 118. Petitioner stated that he only waived his appellate rights because Mr. McMahon and the Jokelsons were "an intellectual influence overtop [sic] of me." Id. at 86. Petitioner's claim fails, as he may not now attack his waiver by asserting grounds which directly contradict statements that he made in a colloquy, under oath.

"A defendant is bound by the statements made during the plea colloquy, and a defendant may not later offer reasons for withdrawing the plea that contradict statements made when he pled." Brown, 48 A.3d at 1277. In Brown, a PCRA petitioner claimed that he pled guilty because he "felt coerced, at the time of his plea hearing, to enter a guilty plea." Id. at 1278. However, as the petitioner had stated during his guilty plea colloquy that *he* had decided to plead guilty, and that he

---

[14] Petitioner claims that allegations of PCRA counsel's ineffectiveness are reviewable for the first time on appeal. 1925(b) Statement, 1/6/2014 at 2 n.1. In support of this position, petitioner refers to Commonwealth v. Lauro, 819 A.2d 100, 109 (Pa.Super. 2002), which states that "PCRA counsel's assistance may be examined on appeal from the denial of PCRA relief." In 2012, the Superior Court called Lauro into doubt, stating that a majority of our Supreme Court has endorsed the view that claims of PCRA counsel's ineffectiveness, post-Grant, may not be raised in the first instance with an appellate court. "Nonetheless, a majority of the Supreme Court agrees that issues of PCRA counsel effectiveness must be raised in a serial PCRA petition or in response to a notice of dismissal before the PCRA court." Commonwealth v. Ford, 44 A.3d 1190, 1200 (Pa.Super. 2012). In this case, petitioner alleged that PCRA counsel was ineffective for failing to argue that trial counsel was ineffective for permitting the Jokelson attorneys to coerce petitioner to waive his appellate rights. As this issue was raised to this Court before a notice of appeal was accepted, this Court had an opportunity to review the issue and it is not being addressed for the first time on appeal.

was satisfied with counsel's representation, the petitioner was prohibited from "offer[ing] contradictory reasons for withdrawing his plea." Id. "Appellant may not be pleased with the results of entering a guilty plea, but he cannot now obtain relief by claiming he felt pressured by counsel to plead guilty." Id.

Likewise, petitioner repeatedly acknowledged that he had not been coerced to waive his appellate rights. Accordingly, he is precluded from now claiming that either his attorney or the Jokelsons "coerced and cajoled" him into waiving his rights.

During a colloquy with this Court and Mr. McMahon, petitioner testified that he was satisfied with Mr. McMahon's advice, and that he was choosing to waive his appellate rights of his "own free will . . . to avoid the death penalty." N.T. 10/22/2008 at 16-17. Shortly thereafter, petitioner equivocated about his decision. Id. at 18-19. After informing petitioner of the possible consequences of proceeding to a penalty phase, this Court permitted petitioner an opportunity to discuss his decision further with his attorney and with his family. Id. at 18-35. When petitioner returned to open court, he reaffirmed that he was the one who elected to waive his appellate rights, and that he had not been "pressured or threatened in any way." Id. at 41-42.

> THE COURT: As to the answers that you've given here today while we've been having this discussion about the waiver of your appellate and Post-Conviction Relief Act rights, were you pressured or threatened in any way in giving any answers that you've given here to the Court?
> PETITIONER: No.
> THE COURT: All right. You understand as I've indicated to you previously that you will be bound by, that means stuck with, the answers that you've given me here today under oath in open court with four attorneys present?
> PETITIONER: Yes.
> THE COURT: And is the decision to give up those appellate rights and PCRA rights, commutation and pardon, being able to seek that, et cetera, has that all been your decision? Who made that decision for you to give up those rights?
> PETITIONER: I did.
> THE COURT: All right. Then I am – and did you have any questions at all whatsoever for me at this point?
> PETITIONER: No.
> THE COURT: All right. Then I am making a finding that Mr. Glass has knowingly, intelligently, and voluntarily given up those appellate rights both for direct appeal as well as

15

post-conviction relief collateral right to seek a challenge to his conviction, to seek commutation and pardon in exchange for the penalty phase not taking place and the possibility of a death sentence being imposed being taken off the table.

Id. at 41-43.

As petitioner's statements under oath *directly* contradict petitioner's current contention that he had been "cajoled" into waiving his appellate rights, this claim fails.

For the foregoing reasons, this Court properly denied and dismissed petitioner's PCRA petition and the dismissal should be affirmed.

BY THE COURT:

_M. Teresa Sarmina_

M. TERESA SARMINA                    J.

16